## ROBBINS v. SEABOARD COAST LINE R.R. CO.
No. 70-10491.

Circuit Court, Duval County.

April 6, 1972.

Beckham & McAliley, Miami, for the plaintiff.

George D. Gabel, Jr. of Kurz, Toole, Taylor, Moseley & Gabel, Jacksonville, for the defendant.

CHARLES COOK HOWELL, Jr., Circuit Judge.

The parties having been heard hereon, it is ordered that plaintiff's motion, filed February 25, 1972, for a new trial, including the additional grounds for the motion interposed on the oral argument thereof, is denied.

*Memorandum:* In the interests of broad, overall, substantial justice, and in the absence of any ready illustrations appended to paragraph EC 7-29 of Cannon 7 of the *Code of Professional Responsibility,* of a "reason to believe that ground for such challenge may exist", the court has gladly cooperated with plaintiff's courtly and talented attorneys in their post-trial forays with the jury under said paragraph — especially since, had the jury accepted the plaintiff's theory of liability and damages, the verdict, from plaintiff's point of view, was so modest as to lend tentative credulity to a wonderment if perchance it was a quotient one.

It was not a quotient one, as convincingly appeared on the examination of each of the six jurors.

Accordingly, "at this stage of the proceedings, all reasonable inferences are resolved in favor of the validity of the verdict," Booker v. Lima, Fla. App. 3, 1966, 182 So.2d 642, 643. And, now, "all testimony and proper inferences therefrom are required to be construed most favorably to the" defendant, Hodges v. Nofsinger, Fla. App. 3, 1966, 183 So.2d 14, 15 — the court has had to steel itself to this realization; so personable and sympathy-inspiring is the fine young man who is the plaintiff.

So construed, the court feels that in view of the comparative negligence feature of the Federal Employers Liability Act this verdict squares with justice as to both the issues of liability and damages; because —

The jury could have attached a degree of negligence to the railroad for having permitted the whitish gray phosphate or other substance of a slippery nature to accumulate in the yard — but still

concluded that the overwhelmingly greater negligence out there on this unfortunate night was that of the plaintiff himself. Here we have a young man of keen vision and good visibility that would enable him to decipher the numbering on the box cars 100 feet away at least. He was of superior athletic ability with the expected impeccable reflexes of the trained basketball player. He knew he was to mount the sill step of the approaching car, which was moving only three to four miles per hour. He consequently had the grab iron in the secure grip of both his hands. There was no lurch of the cut of cars by the engineer. The ground was not wet. There was nothing wrong with the sill step. Actually this was the "best ladder to work in the whole switching track." He had worked this same job before. This same night he had been on duty from 10:59 to 1:45, almost three hours. He knew that phosphate, in the moist conditions created by dewfall, would cling to the soles of his shoes. He knew he was admonished by rule to keep those soles clean and free of all potentially dangerous substances. Yet, according to the witness Counts' statement to the witness Yawn, the plaintiff not only permitted his foot to go "through the sill step" in such a fashion that Counts "didn't think it was anything at all"; plaintiff, even more seriously, failed to use that good grip and strong hands and arms on the lethargically progressing box car to pull himself up, remove his foot, and step back safely on the ground.

Plaintiff's counsel, with characteristic logic, earnestness, and skill, contended perhaps as strongly as anything else, in additional ground 1 of their motion for a new trial dictated into the record at the argument thereof, that the juror W. W. Seaward "made statements of material facts not in evidence and not matters of common knowledge; and that the jury acted upon this."

Cited in support of this position was the case of Russ v. State, Fla., 1957, 95 So.2d 594.

With the utmost deference it is respectfully submitted that *Russ* is not controlling, because of each of these considerations —

1. The language in *Russ*, "like all enunciations of law, must be considered in the light of the factual case before us." Pearson, et al. v. Taylor, Fla., 1947, 32 So.2d 826, 827.

(a) Seaward had no personal knowledge of or familiarity with the practices of the SCL concerning pension or other benefits for its employees — or of the physical characteristics of the ladder, track and yard wherein Mr. Robbins suffered his unfortunate accident. The juror in Russ did have "personal knowledge that [the defendant] had severely beaten the deceased victim on numerous occasions" and "had threatened to kill the deceased victim on

numerous occasions . . ." 95 So.2d 597-598. The *Russ* juror, therefore, reasonably could be expected to exercise much more influence on that jury than the juror Seaward did on his. Please see paragraph 2 hereof, *infra.*

(b) There is nothing in *Russ* to suggest that his counsel was by voir dire examination put on notice that the assailed member of that jury well knew the defendant, and might therefore declaim in the jury room, while considering the verdict, some such observation or confidence that "he had personal knowledge that appellant had severely beaten the deceased victim on numerous occasions", etc. In the case at bar the voir dire examination of the venireman Seaward, before his acceptance, disclosed fully and frankly to the entire courtroom that this man had, after many years service, retired from employment as a railroad switchman with the Jacksonville Terminal Company. And so it is not at all remarkable that Seaward, when questioned in these new trial proceedings, frankly replied, in effect, "They [his fellow jurors] knew I had 23 years' experience with the Terminal Company. When they asked me, I would have been a fool to say 'I don't know. I don't know!' " Recall, please, that *Florida Standard Jury Instruction* 2.2 for use in civil cases clearly tells the jury that "the reasonableness of [the] testimony" of any witness must be "considered . . . *in the light of your own experience...!*" Cf., in this connection, State v. Mulvaney, N. J. Sup. Ct., 1952, 91 A. 2d 359, 361.

(c) *Russ* was a criminal case; and it may not be amiss to differentiate the civil from the criminal at this juncture, since, when jurors in criminal cases seek to impose their personal knowledge upon their fellows, they might indeed "violate [the defendant's] constitutional rights to be confronted by the witnesses against him." Jordan v. State, Tex. Cr. App., 1953, 258 S. W. 2d 85, 86.

2. *Russ* states that "it should be clearly understood that not all statements by a juror concerning evidence not properly before the jury will vitiate a verdict, . . . even though such conduct may be improper." 95 So.2d 601. The rule of law announced is that material facts personally known to one juror and related to the others *"may* vitiate the verdict, *if* resulting prejudice is shown." 95 So.2d 600.

The court does not feel that legal prejudice to plaintiff resulted from any conduct ascribed to the witness Seaward. Mrs. Bernreuter, the forewoman of the jury, when questioned about Seaward's part in the discussions surrounding the 30% disability sustained by the plaintiff according to the medical testimony, said, inter alia, "We felt there must be some compensation . . . I don't know if 'the Union took care of it' . . . all we knew, he had a 30% disability . . . we didn't know he was getting any money. We were given no

answer [to their question of the court concerning the 30%] and had no way of knowing, so we just passed it by. . . . That issue really didn't arise." The juror Theodore Lewis, while remembering that "Mr. Seaward said he knew the Union was paying" the plaintiff, declared, with reference to the 30% issue, "We have to decide that among ourselves." On one occasion Lewis stated that Seaward "didn't mention pension or payments." It was the recollection of the juror Leonard Waldron that Robbins' hospital bill was paid, but that Seaward "didn't mention his pension or disability"; that there was "no comment that a person with a 30% disability would be receiving money from the Union." W. W. Seaward himself said, in essence, that he had remarked that "the railroad benefits would carry him while he was sick off the job . . . the Union would take care of him and see he wouldn't get laid off." Unhurtfully to the plaintiff, the juror Angela Hayes confessed to having heard Seaward remark in the jury room, "I have sued the railroad and gotten money." Seaward also commented that "the man would have a job in the future and the railroad will take care of him. [The jury could have found this from the evidence, anyway.] His doctor bills were paid". While subject to errant memory, the court recalls that this, too, was in the evidence; or at least that there was no testimony the plaintiff had to pay any of the medical bills up to the time of his return to work. None of this presumably impressed the other jurors; Mrs. Virginia Walker, after having replied "I'm not sure", or "I don't know", to several questions propounded to her, and after having finally remembered that Seaward said, "I don't know about the SCL, but the Terminal Company did pay when you were laid up. I think all railroads do", testified that Seaward did not try to influence the other jurors. "He kinda helt back on us when we were making our decision. The man didn't have too much to say. He was kind of stand-offish and quiet."

3. But basically, fundamentally, and with nothing but the most profound professional respect and personal affection for a great court, we nonetheless wonder if, even in a *Russ* situation, our Supreme Court might not now feel that a baring of such statements by a juror in the confidence of his room would be prohibitively delving into matters which inhere in the verdict. Because the Supreme Court, in McAllister Hotel, Inc., v. Port, Fla. 1960, 123 So.2d 339, significantly warns that "the law does not permit a juror to avoid his verdict for any reason which essentially inheres in the verdict itself, as that . . . he was unduly influenced by the statements or otherwise of his fellow-jurors . . .!" *McAllister* cites approvingly — and so, as a matter of fact, did *Russ*, at 95 So.2d 600! — the earlier landmark civil case in Florida of Marks v. State Road Department, Fla., 1954, 69 So.2d 771, 774, 775; first using this same significant language.

The trust that we have not taken liberties with, or distorted, the law of Florida as it would deal with the factual situation in the case sub judice is heightened somewhat upon considering decisions (even in the criminal law field) elsewhere; some of which reveal the protective interests of the various state legislatures in preserving this important right on the part of trial juries to be shielded from a negation of their verdict by their own affidavits on matters inhering therein — Jones v. Kentucky, Ky. App., 1970, 450 S. W. 2d 812, 814; Pinana v. State, Nev., 1960, 352 Pac. 2d 824, 832; State v. Gies, Mont., 1926, 249 Pac. 573; State v. Keller, Mo., 1937, 104 S. W. 2d 247, 248-249; Weekly v. Horn, Ala., 1955, 82 So.2d 341, 342-343; Melvin v. State, Ala., 1945, 21 So.2d 277, 281; Mullins v. State Ala., 1930, 130 So. 527, 530; State v. Murphy, Ariz., 1955, 285 Pac.2d 614, 616; Alley v. State, Ga. App. 2, 1959, 108 S. E. 2d 282, 284-285; State v. Bedwell, Id., 1955, 286 Pac. 2d 641, 645; and State v. Morrow, Ore., 1938; 75 Pac. 2d 737, 744-745.